## Case No. 12,106.

### RUCHER et al. v. CONYNGHAM.

[2 Pet. Adm. 295.] [1]

District Court, D. Pennsylvania. 1805.

SHIPPING—MASTER—REPAIRS—WHEN AUTHORIZED TO HYPOTHECATE SHIP.

1. Case stated. Under what circumstances the master is authorized, by the general powers legally incident to his station, to hypothecate the ship for repairs.

[Cited in Furniss v. Magoun, Case No. 5,163; The Panama, Id. 10,703.]

[Cited in brief in Dunning v. Merchants' M. M. Ins. Co., 57 Me. 112.]

2. The maritime interest and legality of the bond disputed. Great utility and sacred obligation of contracts of bottomry, where necessary and legal.

[Cited in The Hunter, Case No. 6,904.]

3. This should induce caution to prevent their being diverted to improper purposes.

4. Circumstances and causes justifying bottomry bonds: (1) For the safety and progress of the ship. (2) In a foreign port, and not

---

[1] [Reported by Richard Peters, Jr., Esq.]

where the owners reside. (3) Not where the master has goods of his own, or of the owners. For he may pledge goods, freight and ship, or may sell part of the cargo to repair the ship. (4) There must be no other means of procuring money. (5) The sum loaned must be at the risk, and only on the faith of the ship.

[Cited in The William and Emmeline, Case No. 17,687; Leland v. The Medora, Id. 8,237; Greely v. Smith, Id. 5,750.]

[Cited in Braynard v. Hoppock, 32 N. Y. 573.]

5. Hypothecation by the master cannot be for securing engagements not founded solely on credit of ship. Cannot be for advances on the personal credit of owners.

[Cited in Leland v. The Medora. Case No. 8,-237; Greely v. Smith, Id. 5,750.]

6. Whether a consignee may take a bottomry bond, and under what circumstances.

7. The amount of repairs to be charged; but bond and premium declared illegal by the court.

In admiralty.

PETERS, District Judge. The ship America, belonging to the defendants, having on board a very valuable cargo, consigned to the plaintiffs, met with very considerable damage, and arriving in England, was placed under the care of the plaintiffs' house there. The cargo was sent on by other conveyances; and the ship America, having undergone very expensive, and, it is presumed, necessary repairs, was in the Humber, put up for freight, previous to her return to Philadelphia, where she arrived. It appears by the correspondence of Messrs. Rucher & Co. that the repairs of the ship were applied by the persons acting for the plaintiffs' house, on the credit, and for the account, of that house; and not solely, or in any wise, under the idea of a pledge of the ship. It appears also, that the plaintiffs assented to, if not directed the advance of, the monies for the repairs, for account of the defendants, and without any reference to the pledge of the ship, at the time. A bottomry bond was however taken, by the agents of the plaintiffs' house in England; whether with their orders or not does not appear, but for their use, and for the amount of the expenses of repairs, at a premium of twenty per cent. making the sum of eleven hundred and sixty-six pounds sterling.

The question on this part of the cause is, "Whether the bottomry bond be lawfully taken; and the defendant, of course, who does not dispute his liability to the payment of the amount of repairs, answerable for the maritime interest, charged on that instrument." There are no contracts more worthy of the attention of the courts of a maritime nation, than such as are grounded in the true principles which ought to actuate the parties entering into engagements of the nature of this now under consideration. These bonds are called by Sir William Scott, and so treated by all courts and writers on the subject, "bonds of great sanctity, and highly necessary in mercantile affairs." The greater their sanctity, and the more indispensable their necessity, the more carefully they should be guarded, and every diversion from their necessary or sacred usefulness, prevented or discouraged.

The power of the master to hypothecate the ship, is circumscribed by known boundaries; these must be rigidly adhered to, and are generally marked for the security of absent owners, and to prevent abuses by masters, to their injury. The hypothecation is therefore required—1st. To be absolutely necessary for the safety of the ship, and to enable her to proceed on her voyage, and not for any other debt or demand, either precedent or co-existing for other purposes, or on other accounts, or even for similar supplies on other voyages. 2d. It must be made in a strange port, and not in the port where the owners reside; and evidence of its reasonableness and necessity should be obtained and produced. 3d. It must also be where none of the owners are present, and where the master has no goods, (or those, if he hath goods, insufficient) either belonging to his owners or himself; for he may pledge the goods and freight, as well as the ship, or may sell a part of the cargo to repair the ship. 4th. It is essential to the lawful exercise of this power, that no other means of procuring funds, at the place required, should exist. Of course, if the owners have agents or consignees who have either funds or property to furnish, or are bound to afford means, on the personal credit of the owners, this power in the captain is excluded. 5th. The sum loaned must be at risk, and there must not be a personal responsibility; that is, the money must be advanced on the faith of the ship, and at the sole risk of her loss or safety. These circumstances are indispensably necessary, to constitute the legal authority of the captain to hypothecate the ship; without them he has no power, as master, to pledge, by any instrument, the ship or freight. I say nothing here of the mortgages, or bottomries, given on ships by owners: for although they arise out of the usages and maritime arrangements before stated, and are generally regulated by the same principles, yet the power to originate them is in the owner, in his own right; and is not one thrown upon him, as it is upon the captain, by the operation of law, and the necessity of the case.

Tested then by the positions and principles before stated, it will appear, that the bond in question was not given under some of the most essential requisites on which the power of the master is grounded. I add to these positions, as a corollary, that an hypothecation bond must not be diverted from its original and sacred use, to the purpose of securing engagements, not at first founded merely on the credit of the ship, but for advances made on the personal credit of the owners, either voluntarily, by their consignee, agent or friend, or at their request; nor, of course, can it be given as a double security, running along with, and in aid of,

a personal responsibility. The one excludes the other, and they cannot exist together. The risk being solely confined to the ship, is the only justification allowed by the laws of all commercial countries for the maritime interest; or, as it is sometimes called, "usury," or "premium."

In this case, to my view, it indubitably appears that the advances for the repairs done on the ship America (the amount, description, or necessity whereof do not appear by such authenticated documents, as ought to accompany such a transaction) were so done on the credit of the owners; and not on the exclusive, or even partial credit, or intended pledge of the ship: that the plaintiffs, or their partners or agents in England, had in their hands, goods and property of the defendants, which had been in the power and possession of the captain, liable to be pledged, or in part sold, if the occasion warranted, who was therefore not, on this account, in a situation of remediless necessity, and total incapacity to raise funds, otherwise than by the pledge of the ship: that it appears, the plaintiffs were in the habit of giving credit to the defendants, at the time of this transaction, and the circumstances of the defendants were not then in anywise doubtful; if this were essential to the point. It is also clear to me, that the plaintiffs continued to hold the defendants personally liable, thereby taking away one of the ingredients before stated to be essential to the validity of an hypothecation by the master.[2]

The facts of this case, in a great degree, if not entirely, supersede the necessity of discussing the question of the propriety of a

---

[2] In the times of the pride and power of the Romans, their propensities were military, and their pursuits in character with such inclinations; but their patricians, having necessities for wealth to supply expenditures induced by luxury and dissipation, employed their slaves and freedmen in commerce, thereby eluding a law prohibiting their having personally any concern therein. These subordinate ministers to the gainful objects of those who could not themselves directly carry on trade, were regulated by their laws; and their duties and responsibilities designated and settled as well by positive laws, as by judicial decisions. Their exercitor navis, answered to our supercargo, and their navicularius, held a similar station to the present ship or sailing-master; the latter exercised then, as he does now, when solely entrusted therewith, the duties of both. He still retains some of these duties and responsibilities, though the power over the cargo is lodged in the hands of the exercitor, or supercargo, for general purposes. In 2 Emer. Ins. 420, 1, 2, the subject is concisely treated, according to ancient laws and customs, existing in the time of the Romans. In Abbot. (Ph. Ed.) 78, among other authorities, the modern situation of these characters, in our ships, is investigated and discussed. Their duties and responsibilities are pointed out, both as they respect their employers, and those with whom they contract, so as to shew when and to whom they are amenable, in implied or positive obligations. It will also be seen to what extent their principals are answerable, for their conduct and engagements. The remedies at law, have some resemblance to the actio exercitoria of the Roman Codes.

consignee taking a bottomry bond from the master, in virtue of the power given him merely as master. I will only say, that in general, I think there is a legal impropriety and invalidity in such bonds. The practice may lead to abuses and collusions, to charge the owner with unwarrantable and unnecessary usurious premiums. But I will not say that there may not be cases, where the consignee is not bound, more than any other lender, to advance for repairs, without taking the ship as security for a loan on maritime interest. A consignee not in the habit of dealing with or crediting an owner, and not having any goods, funds or means of security at the time, seems not under any obligation to risk his property, without the usual and adequate compensation and security. On the whole I am of opinion, that if the amount of these repairs be properly proved, they must be charged against the defendant; but that the bottomry bond, and the premium in consequence, are illegal, and ought not to bind or be charged in this case, under its particular circumstances.